UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MIGUEL SANCEHZ,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH ALMOND, *in his individual and official capacities*; DANIEL J. MCKEE, *in his official capacity as Governor of the State of Rhode Island*; ANTONIO AFONSO, *in his individual and official capacities*,<br><br>Defendants. | No. 24-cv-319-JJM-RLA |

**MEMORANDUM AND ORDER**

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Before the Court is Plaintiff Miguel Sanchez's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment under Fed. R. Civ. P. 56.[1] ECF Nos. 27, 29. Mr. Sanchez argues that he is entitled to summary judgment because his firing was unlawful in violation of his First Amendment protection. In response, Defendants' cross-motion argues that his termination was the result of a

[1] Plaintiff moves on Count One of his Complaint, leaving damages for the trier of fact. ECF No. 27. The Court is also reserving on Mr. Sanchez's request for injunctive relief seeking to be returned to his state job.

valid government interest and that Mr. Afonso and Mr. Almond are entitled to a qualified immunity defense.[2]

For the reasons below, the Court GRANTS Mr. Sanchez's Motion for Partial Summary Judgment and DENIES Defendants' Cross-Motion for Summary Judgment.

## I. BACKGROUND

### A. Mr. Sanchez's Employment

Mr. Sanchez began working at the office of Rhode Island Governor Daniel J. McKee in May 2021 as a "constituent services" staffer. ECF No. 28 at ¶ 1. The office is "the first point of contact with the public for the Governor's office" where employees handled calls, emails, letters, walk-ins, constituent problems, requests, and questions about the Governor's positions. ECF Nos. 28 at ¶ 2; 29-1 at 3. Mr. Sanchez was not a member of senior staff, and did not formulate policy, or policy developments. ECF No. 28 at ¶ 8; *but see* ECF No. 33 at ¶ 8. While the scope of his employment is shaded differently by the parties, they all agree that his duties involved, among other things, helping Rhode Islanders access public benefits and triaging their concerns by referring them to the appropriate departments. ECF No. 28 at ¶ 4; 30 at ¶ 13; 35 at ¶ 13. The office received roughly 500 calls and 400 emails per month. ECF No. 28 at ¶¶ 5–6. Mr. Sanchez's direct supervisor was David Barricelli, who reported to Joseph Almond, Senior Deputy Chief of Staff, who in turn reported to Antonio Afonso, the

[2] Both parties have filed responses and replies in support of their summary judgment motions. *See* ECF Nos. 32, 34, 35, 37, and 39.

Chief of Staff in charge of hiring and firing in the Governor's office, including Mr. Sanchez. *Id.* at ¶¶ 11–13. Mr. Sanchez's performance was never called into question, and he was never disciplined before his termination. *Id.* at ¶ 14.

**B. Councilman Sanchez, the Protest & Social Media Posts**

In 2022, Mr. Sanchez discussed with Mr. Almond his intent to run for local office. ECF No. 28 at ¶¶ 16–17. No one in the Governor's office stated any opposition or concern with Mr. Sanchez seeking elected office. ECF Nos. 28 at ¶¶ 17, 23; 30 at ¶¶ 22–23. There is no evidence that anyone in the Governor's office instructed Mr. Sanchez to be careful in any of his public statements, or to seek clearance from his superiors before speaking out on issues of public concern in his elected capacity. ECF Nos. 35 at ¶¶ 22–23; 33 at ¶ 18. Mr. Sanchez was elected to serve on the Providence City Council to represent Ward 6 beginning in January 2023. ECF No. 28 at ¶ 19. During the time that he was both a state employee and a Providence City Council member, Mr. Sanchez regularly expressed political views on his personal social media accounts, which referred to his City Council position but never to his job in the Governor's office. ECF Nos. 28 at ¶ 29; 33 at ¶ 29. It is undisputed that none of his posts before October 22, 2023 prompted questions to the Governor, complaints to Constituent Services, or media inquiries, and that no one in the Governor's office had spoken to him about his social media. ECF Nos. 30 at ¶¶ 21–23; 35 at ¶¶ 21–23. Moreover, two other members of the Governor's staff had posted personal views that conflicted with the Governor's positions: a member of the policy staff who called for abolishing the Law Enforcement Officers' Bill of Rights, and a scheduler who

supported a presidential candidate different from the candidate the Governor supported. ECF No. 28 at ¶¶ 68–69. Mr. Almond testified that the scheduler's posts prompted calls to the office. ECF No. 35 at ¶ 20. But neither employee was asked to remove the posts or was fired. ECF Nos. 28 at ¶¶ 68–69; 30 at ¶ 20.

On October 7, 2023, Hamas attacked Israel killing roughly 1,200 people and Israel responded with fierce military actions in Gaza, whose population is overwhelmingly Palestinian. ECF No. 28 at ¶ 24. That day, the Governor's office issued a statement condemning "the abhorrent acts of terrorism by Hamas against innocent civilians in Israel" and expressed solidarity with Israel. ECF Nos. 30 at ¶ 33; 35 at ¶ 33. The same day, Mr. Sanchez posted on his personal social media[3] a call for "respect of all human rights, especially the Palestinian people who faced atrocities for decades[,] and at the same time condemn all attacks on civilians." ECF Nos. 28 at ¶ 31; 30 at ¶ 34. Ten days later, Mr. Sanchez posted that the United States was "actively aiding in a genocide" and called for "immediate deescalation and cease-fire." ECF Nos. 30 at ¶ 41; 35 at ¶ 41.

On October 22, 2023, while off duty, he posted on the platform "X" (formerly known as "Twitter"):

> *"prov did not disappoint … yesterday, I marched with thousands of people calling for an immediate ceasefire and a* [sic] *end to the occupation"*

ECF No. 28 at ¶ 33.

---

[3] No one disputes Mr. Sanchez's account "@MSanchezPVD" represents his employment as a City Councilman not his employment at the Governor's office suggesting that he was acting outside his capacity in the Governor's office.

The video attached depicted scores of people marching in Providence, Rhode Island. ECF No. 28 at ¶¶ 33, 42. Some members of the Governor's staff thought that rally participants had chanted "from the river to the sea." ECF No. 28 at ¶¶ 37–40. That said, nothing suggests that Mr. Sanchez adopted or repeated that phrase nor is there evidence to suggest he endorsed that chant, or is in favor of violence. *Id.* at ¶¶ 34, 41–42.

**C. The Governor's Office Responds**

On October 23rd, the Governor's Director of Legislative and Intergovernmental Affairs, Rico Vota, counseled Mr. Sanchez not to make new posts reflecting his opinion, to keep a low profile, to speak to Mr. Afonso, and to tell the communications team about any media inquiries. ECF No. 28 at ¶ 44. He did not, however, ask him to remove the posts. *Id.* at ¶ 45. Mr. Vota notified Matthew Sheaff, the Governor's Senior Advisor for Communication, who likewise recommended that Mr. Sanchez keep a low profile, which Mr. Sanchez did. *Id.* at ¶¶ 46–47. That same day, two media outlets, NBC 10 WJAR and *The Providence Journal*'s Katherine Gregg, asked the Governor's office about the rally but did not mention Mr. Sanchez or his posts. *Id.* at ¶¶ 48–49. In response, the Governor issued a statement that he "unequivocally condemn[ed] the despicable acts of war and terror perpetrated by Hamas against the people of Israel." *Id.* at ¶ 50.

The next day Ms. Gregg asked the Governor's communications team to confirm that Mr. Sanchez worked for the Governor and Mr. Sheaff replied that "… [a] member of our senior staff has spoken with the individual, and the situation is under review."

*Id.* at ¶¶ 51, 54. Ms. Gregg also contacted Mr. Sanchez, but he did not respond to her and instead told Mr. Sheaff about her inquiry, apologizing for "dragging you guys into this." ECF Nos. 28 at ¶ 58; 30 at ¶ 57; 35 at ¶ 57.

On October 25th, Ms. Gregg published an article identifying Mr. Sanchez as a Constituent Services associate; NBC 10 WJAR and a WPRO radio host then asked the office about him, and NBC 10 reported on the post. ECF No. 28 at ¶¶ 59–63. A state legislator asked Mr. Vota whether the employee in the article "worked downstairs." ECF No. 35 at ¶ 63. On October 26th, Mr. Barricelli reported to Mr. Almond that Constituent Services had received three emails and two phone messages about Mr. Sanchez's post, all after Ms. Gregg's article. ECF No. 28 at ¶¶ 64–65. Mr. Almond did not consider these "to be a lot," and they did not interfere with the office's operations. *Id.* at ¶ 66. Mr. Almond testified that addressing such matters was within his own regular duties, and Mr. Barricelli testified that fielding such comments is the associates' job. *Id.* at ¶¶ 67, 70–71.

**D. October 26 and 27 Meetings and the Termination**

On the afternoon of October 26th, Messrs. Afonso and Almond met with Mr. Sanchez about his post. *Id.* at ¶ 81; *see also* ECF No. 1 at ¶ 41. Mr. Afonso told him that the post sent "a mixed message on the Governor's public stance," and that he "ha[d] the constitutional right to say" whatever he wanted but "doesn't have any constitutional right to work in the Governor's office."[4] ECF Nos. 28 at ¶¶ 82–83; 33

[4] There is an incorrect notion that because someone may not have a right to a government benefit, such as public employment, the benefit may be denied for any reason. "For at least a quarter-century, [the Supreme] Court has made clear that

at ¶¶ 82–83. After the meeting, Messrs. Afonso and Almond discussed the likelihood of continued disruption if the post remained up and whether to give Mr. Sanchez the option to resign. ECF Nos. 30 at ¶ 76; 35 at ¶ 76.

The next day, Messrs. Afonso and Almond met again with Mr. Sanchez. ECF No. 28 at ¶ 91. Mr. Sanchez said that he would leave the post up but was given the choice of resigning or being fired. ECF Nos. 28 at ¶ 93; 35 at ¶ 80. His request to speak with Human Resources was denied. ECF Nos. 28 at ¶ 93; 35 at ¶ 80. Mr. Afonso testified that had Mr. Sanchez offered to remove the post in the meeting, he "might have" kept his job. ECF No. 28 at ¶ 92. Defendants maintain that Mr. Sanchez was terminated because of "the disruption in the office" and "the likelihood of continued disruption if the post were left up." ECF No. 33 at ¶ 92.

**E. Events After the Termination**

No further inquiries or media stories about Mr. Sanchez reached the Governor's office until *after* he was fired. ECF No. 28 at ¶ 98. On October 31st, the communications team began telling reporters that Mr. Sanchez's "words and actions became a major distraction to the daily work of the Governor's office." *Id.* at ¶ 101. The termination drew far more attention than the post had: At least seventeen reporters asked about the firing, at least eleven outlets reported it, and by midday on

---

even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may *not* rely. [The Supreme Court has] rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a "right" or as a "privilege." *Elrod v. Burns*, 427 U.S. 347, 360–61 (1976) (emphasis added) (citations omitted).

November 2nd the Constituent Services Office had logged 63 emails and 38 calls about the firing. ECF Nos. 28 at ¶¶ 102, 104–105; 33 at ¶¶ 102, 104–105.[5]

## II. STANDARD OF REVIEW

Summary judgment is proper when the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether summary judgment is suitable, the court analyzes the record in the light most favorable to the nonmovant and draws all reasonable inferences in that party's favor. *See Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997). "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." *Velazquez-Fernandez v. NCE Foods, Inc.*, 476 F.3d 6, 10 (1st Cir. 2007) (citing *Ingram v. Brink's, Inc.*, 414 F.3d 222, 228–29 (1st Cir. 2005)). More precisely stated, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).[6]

[5] Defendants do not rely on the aftermath attention the office receives but the Court looks to it because it shows, by comparison, the modest scale of the response to the post itself.

[6] The factual record almost exclusively relies on sworn testimony: depositions from Messrs. Afonso, Barricelli, Sheaff, Vota, and Sanchez, and Mss. DaRocha and Palagi but is at times supplemented by documents (*e.g.*, the X posts and video, emails, and texts, news articles, DLT interview notes, etc.).

"When reviewing cross-motions for summary judgment, [courts] must decide whether either of the parties deserves judgment as a matter of law on facts that are not disputed … review[ing] each motion independently, and view[ing] the record in the light most favorable to the nonmoving party …." *Dahua Tech. USA Inc. v. Feng Zhang*, 988 F.3d 531, 539 (1st Cir. 2021); *see also Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996) (holding that cross-motions simply require courts to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed).

"Where . . . a district court rules simultaneously on cross-motions for summary judgment, it must view each motion, separately, through this prism." *Est. of Hevia v. Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010). That is, each motion and the record it provides shall be viewed in the light most favorable to the non-movant. *See id.* "It is settled law that each cross-motion for summary judgment must be decided on its own merits." *P.R. Am. Ins. Co. v. Rivera-Vazquez*, 603 F.3d 125, 133 (1st Cir. 2010). Thus, the summary judgment "standard does not change when the parties cross-move for summary judgment." *Krist v. Pearson Educ., Inc.*, 419 F. Supp. 3d 904, 907 (E.D. Pa. 2019) (citing Auto-Owners Ins. Co. v. Stevens & Ricci Inc., 835 F.3d 388, 402 (3d Cir. 2016)).

For those issues on which the parties did not cross-move, the burden falls first on the movant to assert an absence of genuine issue of material fact that needs resolution at trial. *See Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The burden

then shifts to the nonmovant who must oppose the motion by presenting facts to show a genuine issue of material fact remains.[7] *Id.* A factual issue is genuine if it "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250 (1986). A fact is material if it holds the power to "sway the outcome of the litigation under applicable law." *Nat'l Amusements*, 43 F.3d at 735. The nonmovant must rely on more than "effusive rhetoric and optimistic surmise" to establish a genuine issue of material fact. *Cadle*, 116 F.3d at 960. Instead, the evidence relied on by the nonmovant "must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve . . .." *Nat'l Amusements*, 43 F.3d at 735 (quoting *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989)).

## III. DISCUSSION

The First Amendment protects the right of a public employee to speak on matters of public concern, and that right "is not lost when an individual chooses to work for the government." *MacRae v. Mattos*, 106 F.4th 122, 132 (1st Cir. 2024) (citing *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007)). Public employees' speech on matters of public concern, on their own time, is speech long understood to "occup[y] the highest rung of the hierarchy of First Amendment values." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 585 U.S. 878, 913–14 (2018) (quoting *Snyder v. Phelps*, 562 U.S. 443, 452 (2011)). Nonpolitical public employees do not "surrender" their First Amendment rights by accepting government employment. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 605–06 (1967) (collecting cases). This right is protected even

[7] *See supra* note 2.

when the speech is controversial. *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *Matal v. Tam*, 582 U.S. 218, 246 (2017) (Alito, J., plurality opinion) ("the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate."); *Snyder*, 562 U.S. at 461 ("As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate.").

The Court "must balance the interests of the employee, as a citizen, in commenting upon matters of concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *MacRae*, 106 F.4th at 133 (quoting *Davignon v. Hodgson*, 524 F.3d 91, 100 (1st Cir. 2008)). "This balancing act is commonly referred to as the *Pickering* balancing" after the Supreme Court's decision in *Pickering v. Board of Education of Township High School District 205, Will County*, 391 U.S. 563, 568 (1968). *MacRae*, 106 F.4th at 133. Although this balancing test is a "'fact-intensive' inquiry," it is nevertheless "'a matter of law for the court to decide[.]'" *Id.* at 136 (quoting *Fabiano v. Hopkins*, 352 F.3d 447, 457 (1st Cir. 2003) and *Bruce v. Worcester Reg'l Transit Auth.*, 34 F.4th 129, 138 (1st Cir. 2022)).

### A. The *Pickering* Balancing Test

The parties agree that *MacRae* correctly states the governing framework that derives from *Pickering* and *Garcetti.*[8] *Pickering*, 391 U.S. at 568; *Garcetti v. Ceballos*, 547 U.S. 410, 417–19 (2006); *see* ECF Nos. 32-1 at 6; 27-1 at 17. Under that framework, Mr. Sanchez must show that (1) he spoke as a citizen on a matter of public concern; (2) his interest, and the public's interest, in the speech outweighs the government's interest, as an employer, in the efficient performance of its functions; and (3) the speech was a substantial or motivating factor in the adverse action. *MacRae*, 106 F.4th at 132–33; *Mihos v. Swift*, 358 F.3d 91, 102 (1st Cir. 2004). If Mr. Sanchez makes that showing, Defendants may avoid liability by proving it would have taken the same action absent the speech. *Stuart v. City of Framingham*, 989 F.3d 29, 35 (1st Cir. 2021) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Defendants do not invoke that defense.

Here, the second factor controls the analysis because there is no dispute that Mr. Sanchez spoke as a citizen on a matter of public concern and the Defendants admit that they fired Mr. Sanchez because of his speech.

On Mr. Sanchez's side, speech on public issues occupies the greatest of First Amendment protection, and the stronger the speech interest, the stronger the

---

[8] Defendants do not dispute that the Israel-Hamas conflict was a matter of public concern, characterizing it as a "very divisive issue" and "a large international incident." ECF No. 30 at ¶¶ 85–86.

justification the employer must offer.[9] *Connick v. Myers*, 461 U.S. 138, 145, 152 (1983); *Curran*, 509 F.3d at 48. "Though First Amendment rights are not absolute, *they may be curtailed only by interests of vital importance, the burden of proving the existence of which rests [upon] the government*." *Elrod v. Burns*, 427 U.S. 347, 362 (1976) (plurality opinion) (emphasis added) (citing *Buckley v. Valeo*, 424 U.S. 1, 94 (1976)). Courts look to the nature of the employee's job and to the manner, time, place, and context of the speech. *Decotiis v. Whittemore*, 635 F.3d 22, 35 (1st Cir. 2011); *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

On Defendants' side, legitimate interests include avoiding unnecessary disruption and inefficiency, *Díaz-Bigio v. Santini*, 652 F.3d 45, 53 (1st Cir. 2011), maintaining discipline and harmony in the workplace, *Davignon*, 524 F.3d at 104, and protecting close working relationships that depend on loyalty and confidence, *Rankin*, 483 U.S. at 388. A reasonable prediction of disruption receives significant weight, and an employer need not wait until disruption becomes manifest before acting. *Curran*, 509 F.3d at 49. Courts are more willing to credit such a prediction where some disruption has occurred. *MacRae*, 106 F.4th at 139 (citing *Davignon*, 524 F.3d at 105).

The employer's asserted justification must be the actual reason for the decision, not a post hoc rationalization. *Bruce*, 34 F.4th at 139. A "mere incantation" of workplace harmony is not enough, and the court takes a "fresh look" at the facts

---

[9] The interest by the employee and the public is heightened when the employee is also an elected official, as was Mr. Sanchez.

rather than accepting the employer's view of them. *Davignon*, 524 F.3d at 103, 105. When an employee speaks off duty on a topic unrelated to his employment, the government's justification must be "far stronger than mere speculation." *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) (per curiam) (quoting *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 475 (1995)). And an action taken out of disagreement with the employee's message places no legitimate government interest on the employer's side of the scale. *Mihos*, 358 F.3d at 103.

**1. The 'Policymaking' Role**

As a lead in, Defendants add a threshold argument under the *Elrod–Branti* line of cases, contending that a "communicator" on the Governor's staff is a policymaker whose dismissal for political disagreement does not offend the First Amendment. ECF No. 32-1 at 2–6. In doing so, they argue that Mr. Sanchez's public-facing role was that of a "communicator" whose position left him unprotected against dismissal for speech at odds with the Governor's political position. *See Flynn v. City of Boston*, 140 F.3d 42, 46–47 (1st Cir. 1998) (holding that the First Amendment does not bar dismissing an employee for political reasons where the position falls within the *Elrod–Branti*[10] "policymaking exception.").

The *Elrod–Branti* inquiry does not apply here because Mr. Sanchez held an entry-level, non-policymaking position and the line of cases cited involves dismissals

[10] *Branti v. Finkel*, 445 U.S. 507 (1980)

for inapplicable reasons.[11] The record also shows, from Defendants' own witnesses, that Mr. Sanchez's position carried no authority to make or shape policy, no access to confidential deliberations, and no authority to speak for the Governor beyond relaying positions already set by the Governor and his policy staff, often from a script. ECF Nos. 28 at ¶¶ 7–8; 35 at ¶¶ 7, 9, 11. His public contact was predominantly customer service with certain information technology-like duties, most of which were conducted anonymously.

The Court agrees with Mr. Sanchez: he did not hold a position that the First Amendment leaves unprotected, instead, his personal political speech is balanced under the *Pickering* ambit. Rhode Island places every employee of the Governor's office in the unclassified service, including officers and secretaries, but the label says little about the functions of Mr. Sanchez's position. R.I. Gen. Laws § 36-4-2(a)(3). Mr. Sanchez contends that constituent services associates do not help develop policy, attend senior staff meetings, or share personal opinions with constituents. ECF No. 28 at ¶ 8. Mr. Barricelli testified, however, that associates would independently provide constituents with the Governor's policy positions and that every staff member is an unclassified employee serving at the Governor's pleasure. ECF Nos. 33 at ¶ 8; 30 at ¶ 5; 32-1 at 5 (placing "[o]fficers, secretaries, and employees of the office of the governor" in the unclassified service).

[11] Although *Flynn* involved mid- or upper-level officials significantly connected to policymaking, *Elrod* articulated the broader constitutional rule and recognized an exception for policymaking positions—neither of which are relevant here.

This is a dispute about characterization, not about what associates did in their everyday jobs. Both accounts have associates communicating positions already established by the Governor and his policy staff, without discretion to alter them. ECF No. 35 at ¶¶ 7, 11. And an entry-level associate who reads back a script exercises no discretion that a loyalty requirement could protect. ECF Nos. 28 at ¶ 7; 35 at ¶¶ 7, 9. Moreover, Defendants' reliance on an Eleventh Circuit opinion carries little weigh, if at all, in their favor because it involves an administrative assistant whose position entailed "extensive public contact on behalf of the governor's office." *Bates v. Hunt*, 3 F.3d 374, 376 (11th Cir. 1993). The same cannot be said of Mr. Sanchez: his anonymity and surface level interaction with members of the public is more akin to an employee who is less empowered to convey policy the way that a policymaker would.

For those reasons, Mr. Sanchez was not a policymaker or communicator as a matter of law, he did not hold a position that would cause the public to confuse his position with that of the Governor, and he had no independent policy authority or power. Mr. Sanchez therefore prevails over this threshold *Pickering* factor.

**2. Confusion and "Mixed Messages"**

Defendants contend that the post sent "a mixed message on the Governor's public stance." ECF No. 28 at ¶ 82. Mr. Afonso testified that some constituents conflated Mr. Sanchez's view with the Governor's. ECF No. 33 at ¶ 80. Even so, there was little room for genuine confusion. Mr. Sanchez's account identified him as a city

councilor and never mentioned the Governor. ECF No. 28 at ¶¶ 29; 51; 59. The press, not the post, connected him to the Governor's office. *Id.*

Crediting Mr. Afonso's testimony, nothing in the record shows that constituents conflated Mr. Sanchez's position with the Governor's that was traceable to the post itself. Mr. Sanchez's account cannot be reasonably understood as speaking on behalf of the Governor such that it would cause confusion in either the Governor's office or the public's perception.

**3. Actual Disruption**

Crediting Defendants' version of the record, in the five days between the post and the termination, the Governor's office received: one *Providence Journal* inquiry following up on the social media posts; three emails and two telephone messages from the public; a question posed by a state legislator in the elevator to Mr. Vota; and a few other questions from NBC 10 and a WPRO radio host. ECF Nos. 28 at ¶¶ 51, 59–65; 35 at ¶ 63. The Court also credits Ms. Darocha's recollection that the Governor was asked about Mr. Sanchez at press gaggles that week, ECF No. 33 at ¶ 75; Mr. Sheaff's testimony that the matter "encompassed [his] day," ECF No. 30 at ¶ 69; testimony that time spent on the matter was time not spent elsewhere, ECF No. 33 at ¶ 74; and the decision not to put an optional event on the Governor's calendar, ECF No. 30 at ¶ 71.

Mr. Almond testified the inquiries were not "a lot" and "did not interfere with the operation of the office" and Mr. Barricelli testified that handling such communications was essentially his associates' job. ECF No. 28 at ¶¶ 66–67, 70–71.

By its own account, that office spends roughly "85 percent" of its time responding to current events and media inquiries. ECF No. 28 at ¶ 27. Better said by Mr. Sheaff, "[i]t's very common that the Governor gives a statement or his thoughts on news of the day …[;] [i]t's just part of the job of being a governor." ECF No. 28 at ¶ 28. This is the ordinary business of a governor's office and nothing in the record suggests that the post affected the Governor's own work, his relationship with his staff, or the office's ability to serve constituents in an unusual way.[12] Balancing these facts, and considering the Defendants' burden on this issue, the Court settles this score firmly against Defendants.

**4. Predicted Disruption**

Defendants contend, both in their papers and at oral arguments, that disruption to the Governor's public interest would continue had Mr. Sanchez's post remained on the internet. ECF Nos. 30 at ¶ 76; 32-1 at 9; *Min. Entry, Hr'g on Cross-Mots. for Summ. J.*, No. 24-cv-319, (D.R.I. Oct. 14, 2026). The Court is unconvinced by that speculative argument. By the time of the October 27th meeting, the inquiries had stopped and no other stories reached the office until after Mr. Sanchez was terminated. ECF No. 28 at ¶ 98. In fact, as noted earlier, the termination itself produced dramatically more attention than the post did. *Id.* at ¶¶ 102, 104–105. At least seventeen reporters asked about the firing, eleven outlets reported it, and by

[12] Defendants also point to Mr. Sanchez's later acknowledgment that he had "put[] the [G]overnor in a tough situation" and that, "given my day job, these kinds of things can get messy quickly." ECF No. 30 at ¶ 87. Though affecting the Court's calculus, an employee's recognition that his speech is affecting his employer does not supply Defendants with the artillery they think it does.

midday on November 2nd, the Constituent Services Office had logged 63 emails and 38 calls about the firing. ECF Nos. 28 at ¶¶ 102, 104–105; 33 at ¶¶ 102, 104–105. The alleged distraction caused by his post pales in comparison to the inquiries after the firing. Accordingly, this tips the scale decisively in favor of Mr. Sanchez.

**5. Mr. Sanchez's Interest**

Taken together, Mr. Sanchez's interest, and the public's interest, in his off-duty speech on a matter of intense public concern is at its height. Mr. Sanchez's First Amendment interests are paramount. Defendants rely heavily on what can otherwise be characterized as a modest public and press reaction that their own witnesses described as "not … a lot," that did not interfere with the office's operations, and that fell within the ordinary duties of the staff who handled it. At the same time, Defendants had twice tolerated similar staff members' public disagreement with the Governor that were ostensibly given different treatment. Mr. Sanchez held no policymaking, confidential, or spokesperson role. He advised his superiors of his intent to run for office, which would almost certainly require taking political positions one way or another and no one, including Mr. Barricelli, objected or placed restrictions or disclaimers about what those political positions encompass. Defendants' disagreement with Mr. Sanchez's post places nothing legitimate on their side of the balancing scale. Viewing the record in the light most favorable to Defendants, Mr. Sanchez's termination violated the First Amendment.

### B. Qualified Immunity[13]

"Qualified immunity protects public officials from § 1983 suits for damages if their actions d[o] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ciolino v. Gikas*, 861 F.3d 296, 302 (1st Cir. 2017) (internal quotations omitted). A qualified immunity inquiry consists of two parts: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation." *Id.* at 303 (internal quotations omitted). This second prong is divided further into two additional elements:

> "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable [official] would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable [official] would have understood that his conduct violated the right."

*Id.* (quotations omitted).

#### 1. Constitutional Right

As has been stated extensively at this point, Mr. Sanchez is alleging that his First Amendment rights were violated through adverse action taken because, outside of his government employment, he publicly expressed his views on an issue of public

[13] Qualified Immunity, even if it applied, would only immunize the Defendants from Mr. Sanchez's claims for damages, not for his request for injunctive relief – including his reinstatement.

concern.[14] To recap, "[o]fficial reprisal for protected speech offends the Constitution [because] it threatens to inhibit exercise of the protected right, and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (internal quotations omitted) (citation omitted). Mr. Sanchez's First Amendment constitutional rights were violated and the first factor in determining whether the Defendants enjoy qualified immunity has been overcome. The Court moves to the two-part "clearly established factor."

**2. Clearly Established**

The second prong of a qualified immunity analysis is divided into two additional prongs:

> "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable [official] would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable [official] would have understood that his conduct violated the right."

---

[14] Defendants argue that Mr. Almond cannot be individually liable because he lacked authority to terminate Mr. Sanchez and did not recommend the termination. ECF No. 32-1 at 12–13. But § 1983 liability turns on each defendant's "own individual actions," *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009), not on who held final authority; *see Guadalupe-Báez v. Pesquera*, 819 F.3d 509, 515 (1st Cir. 2016). The undisputed record shows more than Mr. Almond's presence. Addressing the post fell within his responsibilities. ECF No. 28 at ¶ 67. He attended both meetings. *Id.* at ¶¶ 81, 91. Between them, he and Mr. Afonso discussed the likelihood of continued disruption and whether to offer Mr. Sanchez the option to resign. ECF Nos. 30 at ¶ 76; 35 at ¶ 76. He agreed with the decision. ECF No. 28 at ¶ 92. And he was present when Mr. Sanchez was told to resign or be fired, *id.* at ¶ 93. Mr. Almond thus took part in deliberating on and carrying out the termination.

*Ciolino*, 861 F.3d at 303 (internal quotations omitted). Each of these prongs must be evaluated independently.

**i.** *Sufficient Clarity*

As to the first prong, an inquiry as to whether conduct is clearly established by law "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)) (per curiam). Therefore, "[a] clearly established right is one sufficiently defined at a level of specificity that would put a state actor . . . on fair notice that his specific actions offended the constitution." *Morelli v. Webster*, 552 F.3d 12, 23 (1st Cir. 2009).

This Court will not spend much time discussing the legal contours, as they are sufficiently clear and not in dispute. As has been stated numerous times: "[o]fficial reprisal for protected speech offends the Constitution [because] it threatens to inhibit exercise of the protected right, and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman*, 547 U.S. at 256 (2006) (emphasis added) (internal quotations and citation omitted). And the First Circuit has long held that positions without policymaking, confidential, or communicator authority are protected from dismissal for political disagreement. *Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236, 241–42 (1st Cir. 1986) (en banc). It has also denied qualified immunity to a governor who removed an official because of disagreement

with his vote on a matter of public concern. *Mihos*, 358 F.3d at 108. Mr. Sanchez's case falls squarely within these precedents.

Mr. Sanchez's rightful emphasis on Mr. Afonso's statement that he had "the constitutional right to say" whatever he wanted underscores this element. ECF No. 28 at ¶ 83. Qualified immunity is an objective inquiry, so an official's subjective understanding neither establishes nor defeats the defense, but the remarks by Mr. Afonso are sufficiently consistent with the notice the law provides insofar as it acknowledges the existence of a constitutional right to free expression. *See generally Anderson v. Creighton*, 483 U.S. 635 (1987). A reasonable official in Messrs. Afonso and Almond's position would know, or should have known, that they were not able to retaliate against Mr. Sanchez for his social media post. As such, Mr. Sanchez's right was clear, and a reasonable official would have "clear notice" of the right. *Ciolino*, 861 F.3d at 303.

**ii.** *Factual Context*

As to the second prong, the Court is required to examine a fact-specific inquiry into whether, at the time of the alleged conduct, existing law clearly established that the official's conduct was unlawful under the circumstances he confronted. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001) ("The relevant, dispositive…inquiry is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted."). Thus, the inquiry is not merely whether the conduct violated the law, but whether the unlawfulness of that conduct was sufficiently clear under the particular facts of the case. Irrespective of the Court's analysis in the first

prong, the answer to the second element can be considered dispositive as to whether qualified immunity applies.

As Defendants concede in their Response to Mr. Sanchez's Statement of Undisputed Facts, and as Mr. Sanchez affirms in his deposition, Mr. Afonso told Mr. Sanchez that he had a constitutional right to say whatever he wanted. This is, at bottom, evidence of the fact that officials of the Governor's office were on notice that they could not impede Mr. Sanchez's constitutional rights by compelling him to take down the post. Both the Chief of Staff and the Deputy Chief of Staff of the Governor knew or should have known that they should not retaliate against Mr. Sanchez for exercising his constitutional right. Yet the following day Mr. Sanchez was terminated from his employment right after Mr. Afonso acknowledged that Mr. Sanchez had a right to express himself.

And since the record provides indication that both Mr. Almond and Mr. Afonso knew or should have known that retaliating against Mr. Sanchez would deny him his rights, Defendants' Motion for Summary Judgment regarding qualified immunity is DENIED.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment, ECF No. 27, is GRANTED as to liability on his First Amendment claim against Defendants Antonio Afonso and Joseph Almond in their individual capacities and

against all Defendants in their official capacities. Defendants' Motion for Summary Judgment, ECF No. 29, is DENIED.[15]

The matter of damages and injunctive relief remains.

IT IS SO ORDERED.

***/s/John J. McConnell, Jr.***

_______________________________

John J. McConnell, Jr.
United States District Court
Chief Judge

October 28, 2026

---

[15] Mr. Sanchez also raises issues with a position he applied for at the state Department of Labor and Training. The Court DENIES Mr. Sanchez summary judgment on this count and GRANTS Defendants' because there is no evidence that the action of not hiring was an adverse employment action and there is insufficient evidence that it was casually related to the Governor's staffs' actions.